1  MICHAEL S. LAWSON (SBN 048172)
   City Attorney
2  RAFAEL E. ALVARADO JR. (SBN 247904)
   Assistant City Attorney
3  MICHAEL VIGILIA (SBN 228353)
   Assistant City Attorney
4  JOSEPH BRICK (SBN 253132)
   Deputy City Attorney
5  CITY OF HAYWARD
   777 B Street, 4th Floor
6  Hayward, CA 94541-5007
   Tel: (510) 583-4450
7  Fax: (510) 583-3660

8  Attorneys for Defendant City of Hayward,
   Former Police Chief Ron Ace, Officers Loring Cox,
9  Michael Miller and Robert Purnell

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  CHINA McKAY AND JONATHAN          Case No. CV 12-1613 (NC)
    PORTERO-BROWN, INDIVIDUALLY AND
15  AS SUCCESSORS-IN-INTEREST TO THE
    ESTATE of JESSE PORTER; and JESSE
16  PORTER JR., INDIVIDUALLY, AS       DECLARATION OF RAFAEL E. ALVARADO
    SUCCESSOR-IN-INTEREST TO THE       JR., IN SUPPORT OF DEFENDANTS'
17  ESTATE OF JESSE PORTER, AND AS     MOTION FOR SUMMARY JUDGMENT, OR
    PERSONAL REPRESENTATIVE OF THE     IN THE ALTERNATIVE FOR SUMMARY
18  ESTATE OF JESSE PORTER,            ADJUDICATION OF CLAIMS

19

20              Plaintiffs,

21  v.

22  CITY OF HAYWARD, FORMER HAYWARD
    POLICE CHIEF RON ACE, IN HIS
23  INDIVIDUAL AND OFFICAL CAPACITIES,
    HAYWARD POLICE OFFICERS LORING
24  COX, MICHAEL MILLER and ROBERT
    PURNELL, and DOES ONE through TWENTY
25  FIVE, inclusive,

26              Defendants.

27

28

I, Rafael E. Alvarado Jr., declare as follows:

1.     I am an attorney in good standing licensed to practice before the Courts of the State of California and before this Court. I am employed by the City of Hayward as an Assistant City Attorney and represent Defendants in this matter. I submit this declaration in support of Defendants' motion for summary judgment, or in the alternative for summary adjudication of claims.

2.     Attached hereto as Exhibit A is a true and correct copy of referenced portions of the deposition transcript of Police Officer Craig Fovel, taken in this case.

3.     Attached hereto as Exhibit B is a true and correct copy of referenced portions of the deposition transcript of Police Officer Joseph Rubalcava, taken in this case.

4.     Attached hereto as Exhibit C is a true and correct copy of referenced portions of the deposition transcript of Crime Scene Technician Lisa Reinke, taken in this case.

5.     Attached hereto as Exhibit D is a true and correct copy of referenced portions of the deposition transcript of plaintiff Jeff Dimick, taken in this case.

6.     Attached hereto as Exhibit E is a true and correct copy of referenced portions of the deposition transcript of plaintiff Jonathan Portero-Brown, taken in this case.

7.     I have personal knowledge of the foregoing facts and, if called and sworn as a witness, can testify competently thereto.

I declare under penalty of perjury under the laws of the United States and the laws of the state of California that the foregoing is true and correct.

Executed this 24th day of April, 2013, in Hayward, California.

                           /s/ Rafael E. Alvarado Jr.
                           RAFAEL E. ALVARADO JR.

McKay et al. v. City of Hayward, et al.
USDC Case No. CV 12-1613

-2-

Declaration of Rafael E. Alvarado Jr., In Support
of Defendants' Motion for Summary Judgment

Exhibit <u>A</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHYNA MCKAY AND JONATHAN PORTER,
INDIVIDUALLY AND AS
SUCCESSORS-IN-INTEREST TO THE
ESTATE OF JESSE PORTER; AND JESSE
PORTER JR., INDIVIDUALLY, AS          CASE NO. CV121613
SUCCESSOR-IN-INTEREST TO THE
ESTATE OF JESSE PORTER, AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF JESSE PORTER,

        Plaintiffs,

-vs-

CITY OF HAYWARD, FORMER HAYWARD
POLICE CHIEF RON ACE, IN HIS
INDIVIDUAL AND OFFICIAL
CAPACITIES, HAYWARD POLICE
OFFICERS LORING COX, MICHAEL
MILLER, and ROBERT PURNELL, and
DOES ONE through TWENTY FIVE,
inclusive,

        Defendants.
_____/

**CERTIFIED COPY**

DEPOSITION OF OFFICER CRAIG J. FOVEL

Taken before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958

February 13, 2013

DEPOSITION OF CRAIG J. FOVEL

1    the radio is important.  Because when somebody gets in

2    trouble, that's what we call on.

3         So we try to stay off the radio as much as

4    possible, and we do things via the computer if it's

5    possible.  That way she can attach herself to the call

6    without getting on the radio and saying, "Hey, attach

7    me."  Which, really, at that time is superfluous

8    communication.  You don't need it.

9         Q. How is it that each of these individuals

10   respond?  Is it that dispatch sends it out citywide and

11   then whichever officers respond, they just on their own

12   decide to respond?

13        A. Yeah.  Typically -- I'll use "typically,"

14   because, again, sometimes it's a little bit different.

15   But, typically, with a robbery with a gun, dispatch will

16   triple beep it.  I don't know if you've heard of the

17   term, but it's basically to get everybody's attention.

18   What you'll hear on the radio is "beep beep beep," and

19   then everybody basically stops what they're doing and

20   listens.  Because that is a high-priority detail that is

21   in progress.

22        So when that happens, again, everybody is

23   listening, so everybody hears it.  So people who are

24   available who are in the area and stuff a lot of times

25   will start flowing.  Even though they may not be

1    dispatched to it by dispatch, they'll start flowing in

2    that direction based upon what they're doing, where

3    they're at.  A host of different things come into play

4    there.

5         So you may -- who knows where different people --

6    I can't tell from this who responds from where.  I can't

7    tell you where I responded from.  But everybody is in

8    different spots in the city.  And they may be closer

9    than you might think.

10        And Jewel Smith, she attached herself to this.

11   And for whatever reason, she was free.  Looking at the

12   time, they just got robbed, and the first information is

13   suspect with a gun.  That's kind of a tense situation.

14   So you got a bunch of cops flowing in the area trying to

15   figure out, trying to find this guy.

16        Q. A little bit lower under the Jewel Smith

17   entry is 2232, "ASSTER K93."  That's Loring Cox.

18        A. Yes, ma'am.

19        Q. Did he attach himself?

20        A. Yeah.  It looks like it, yeah.

21        Q. How can you tell?

22        A. Again, it's his -- the alphanumeric, using

23   your term, the CL, Charles Lincoln 0712, corresponds to

24   the Charles and then 0712.  Do you see that?

25        Q. Yes.

1    entered on to the log?

2         A. If it comes in too fast sometimes.  And then

3    they're getting -- as you see, they're not writing in

4    sentences like plain text.  They're throwing as much

5    information as they can possibly can throw in a short

6    period of time.  So there are times when information is

7    put out that I've not seen it in a CAD detail before.

8    But according to this detail, that was what was in the

9    detail at that point.

10        Q. We'll go to the next page, then, at 2233,

11   2234, and 2235.  Now there are three officers on scene,

12   right?

13        MR. ALVARADO:  Objection.  Calls for speculation.

14        You can answer to the extent you can.

15        THE WITNESS:  The computer shows David 2 on the

16   scene and John 3 on scene.

17        MS. CHENG:  Q.  And then David 3, which is you?

18        A. Yes, ma'am.

19        Q. And K93, which is Officer Cox?

20        A. Yes, ma'am.

21        Q. So within at least those two minutes, all

22   four of you are on the scene?

23        A. Yes, ma'am.

24        Q. And then the next information at 2236, what

25   information is that, that suspect update, "BMA 5'8",

1   160, 30-40"?

2          A. That's going to be me relaying to dispatch

3   the suspect description I get from the employees at

4   Domino's.

5          Q. Tell us what information you got from the

6   folks at Domino's.

7          A. I updated them that -- again, just kind of to

8   reiterate.  It's a BMA.  His height is five-eight.  His

9   approximate weight is 160.  His approximate age 30 to

10  40.  Again, that he had a black bandana, black hoodie,

11  black semiautomatic.  And that the direction of flight

12  was north towards Jack in the Box or towards North Lane.

13         Q. Where is the Jack in the Box that you're

14  referring to there?

15         A. Jack in the Box at the corner of Clawiter is

16  just north of Domino's.

17         Q. Let me show you a map.  I'll have you point

18  out for me the area.

19         MR. ALVARADO:  Objection.  What area are you

20  speaking of?

21         MS. CHENG:  Q.  The direction in which you were

22  told that the suspect went.

23         A. So north toward Jack in the Box would put

24  them north on Clawiter Road toward Winton.

25         Do you want me to make a mark?

1          Q. Yes, please.  Go ahead and mark.

2          A. I'll use a green arrow and marking north from

3     the Domino's, north on Clawiter Road toward Winton.  And

4     then there's a parking lot that is directly north of the

5     Domino's store that is open out onto Saklan Road, which

6     is east, going in an easterly direction, which is where

7     North Lane is at.  So it would be -- I'll use, again,

8     two green arrows.  One going north and another one going

9     east.

10         Q. All right.  So explain to me.  You believe

11    that at that time there was one suspect?

12         A. Yes, ma'am.

13         Q. But you have two different directions?

14         A. Yes.

15         Q. So explain your understanding of which

16    direction the suspect went.

17         A. The suspect came out the Domino's door.  The

18    Domino's front door faces Clawiter.  It faces west.  The

19    clerk told me that he took a right out of there and then

20    disappeared out of his vision.  That would mean that the

21    suspect went north at that point out of the employee's

22    vision.

23         At that point there's really kind of two

24    directions to go.  Either continue north on Clawiter

25    toward Winton or to go east through the parking lot

1         THE WITNESS:  Yeah.  The manager of the place

2    is -- Shakaib Rahimi.  He's the manager.  He responded

3    to the store because he could look at the security

4    video.

5         MS. CHENG:  Q.  What time did you get the

6    security video?

7         A. I show an updated dispatch on the CAD detail

8    at 2305 that shows two suspects on video.  It's on

9    Page 2.

10         Q. Yes.  Bates stamp page HPD 32.

11         A. So at 2305 I update there's two suspects on

12    video.  One suspect never came into the store.  And the

13    DOF, which means direction of flight, was back through

14    the parking lot towards North Lane.

15         Q. If we go back to my map, can you show us on

16    here, then, what direction you saw in the video the

17    suspect fleeing?

18         A. It would be the green arrow that points in an

19    eastbound direction through the parking lot just north

20    on the north side of that business.

21         Q. Where is North Lane?

22         A. Right here.  This complex right here in

23    North Lane is a well-known complex.  We spent a lot of

24    time there.

25         Q. What complex is that?

1          A. It's on the 1400 block of North Lane.  I

2    don't know the exact addresses.

3          Q. What is that?

4          A. It's an apartment complex.

5          Q. Let's take the red pen, then, and can you

6    circle the apartment complex where North Lane is?

7          A. The complex runs from Saklan down to the

8    corner of Eden Avenue.  To Saklan on North.  That whole

9    block is the apartment complex.

10          Q. And on the video, what were you able to see?

11          A. I was able to see that there were --

12          Q. I'm sorry.  Let me ask one foundational

13    question.

14          What was the position of the video camera?

15          A. There's a couple different cameras that

16    show -- that I utilized.  There's cameras on the

17    interior of the business that show the counter area, I

18    guess the front counter area.  There's a camera that

19    points out the door, the front door, and covers some of

20    the front of the business.  And then there's a camera on

21    the -- it would be the north side of the building that

22    shows a partial view of the parking lot that's on the

23    north side of the building.

24          Q. So is it the last camera that gives you the

25    best view of the suspects going through the parking lot?

DEPOSITION OF CRAIG J. FOVEL

1      A. The camera -- yes.  The camera that is on the

2   north side of the building which shows a partial view of

3   the parking lot is a camera that you can see the

4   suspects approach and then the suspects leave in the

5   same direction.

6      Q. And how much of the parking lot are you able

7   to see from that camera, the one on the north side of

8   the building?

9      A. Approximately 40 feet, 50 feet.

10     Q. Not the entire parking lot?

11     A. No, ma'am.

12     Q. And you said you're familiar with the

13  apartment complex at the 1400 block of North Lane?

14     A. Yes, ma'am.

15     Q. Why are you familiar with that?

16     A. We have a lot of calls for service there.

17     Q. What kind of calls for service?

18     A. All kinds of calls for service.  Everything.

19  We've had domestic violence, robberies, stolen vehicles.

20  Those are just some of the ones I recall.

21     Q. So when you saw the video, was it your

22  suspicion that the suspects had gone into that apartment

23  complex of the 1400 block of North Lane?

24     A. When I saw the video, I suspected they were

25  going back in that direction; yes, ma'am.

1    STATE OF CALIFORNIA  )
                          )  ss
2    COUNTY OF ALAMEDA    )

3

4

5        I, Joan Grier, hereby certify that the witness in the

6    foregoing deposition named

7

8                    OFFICER CRAIG J. FOVEL

9

10   was by me duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth in the within-entitled

12   cause; that said deposition was taken at the time and

13   place herein named; that the testimony of said witness

14   was reported by me, a certified shorthand reporter and a

15   disinterested person, and thereafter transcribed into

16   typewriting.

17

18       And I further certify that I am not of counsel or

19   attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said caption.

22

23   Date  _2/20/13_              _Joan Grier_
                                  Joan Grier, C.S.R.
24

25

53



# HAYWARD POLICE DEPARTMENT
## POLICE REPORT
300 West Winton Avenue  Hayward, California 94544  (510) 293-7272

| | | | |
|---|---|---|---|
| Report Type: | **Incident Report** | Report Number: | **2011-09708** |
| Reporting Officer: | **Officer C. Fovel (446)  fc0224** | Report Taken Date: | **05/30/2011** |
| Occurred From: | **Sunday     05/29/2011     10:28 PM** | Case Status: | **Open** |
| Occurred To: | | Clearance Type: | |
| Reported Date/Time: | **05/29/2011     10:30 PM** | Clearance Date: | |

| | | | |
|---|---|---|---|
| Incident Type: | **211 PC Robbery** | Beat: | **D** |
| Attempted/Completed: | **Completed** | Offense Code: | **3** |
| Location Occurred: | **22962  Clawiter Road 2 Hayward CA 94544** | | |
| Cross Street: | | Location Type: | **Commercial/Office Building** |

| | | | |
|---|---|---|---|
| Approving Supervisor: | **Sergeant R. Pola (104)** | Approval Date/Time: | **05/30/2011     03:33 AM** |

---

| Subject: | **Victim** | | DOB: | |
|---|---|---|---|---|
| Name: | **Dominos Pizza,** | | | |

Status:

| Race: | | Height: | | Complexion: | |
|---|---|---|---|---|---|
| Gender: | | Weight: | | Eyes/Hair | |
| Facial | | | | Color: Build: | |

Additional Information:   This report data was entered by: fc0224

Address:   Business Address   22962   Clawiter Road 2 Hayward CA 94544      Phone:

Additional Info:

---

| Subject: | **Victim** | | DOB: | **05/20/1991** |
|---|---|---|---|---|
| Name: | **Qadir, Masood** | | | |

Status:

| Race: | **Other** | Height: | | Complexion: | |
|---|---|---|---|---|---|
| Gender: | **Male** | Weight: | | Eyes/Hair | |
| Facial | | | | Color: Build: | |

Additional Information:   This report data was entered by: fc0224
Age at the time of incident(Occurence date): 20.0

Identification:

Address:   Home   34947   Kinglet Court   Union City CA 94587      Phone:

Additional Info:

---

| Subject: | **Witness** | | DOB: | **08/14/1991** |
|---|---|---|---|---|
| Name: | **Meher, Ramin** | | | |

Status:

ΔπEXHIBIT
Fovel
Deponent
3/13/13 Rptr. 6
WWW.DEPOBOOK.COM

---

Officer C. Fovel (446)  fc0224                              1                              2011-09708

| | | | |
|---|---|---|---|
| Race: **Other** | Height: | Complexion: | |
| Gender: **Male** | Weight: | Eyes/Hair | |
| Facial | | Color | |
| | | Build: | |

Additional Information:  **This report data was entered by: fc0224**
**Age at the time of incident(Occurence date): 19.0**

Address:   Home   **27279   Sleepy Hollow   201   Hayward   CA**                     Phone:

Additional Info:

---

Subject:  **Witness**                                                          DOB:  **03/14/1987**
Name:  **Rahimi, Shakaib**

Status:

| | | | |
|---|---|---|---|
| Race: **Other** | Height: | Complexion: | |
| Gender: **Male** | Weight: | Eyes/Hair | |
| Facial | | Color | |
| | | Build: | |

Additional Information:  **This report data was entered by: fc0224**
**Age at the time of incident(Occurence date): 24.0**

Address:   Work   **22962   Clawiter Road   2   Hayward   CA   94544**              Phone:

Additional Info:   manager of Dominos

---

Subject:  **Witness**                                                          DOB:  **06/14/1984**
Name:  **Tserenbal, Odonbayar**

Status:

| | | | |
|---|---|---|---|
| Race: **Asian** | Height: | Complexion: | |
| Gender: **Male** | Weight: | Eyes/Hair | |
| Facial | | Color | |
| | | Build: | |

Additional Information:  **This report data was entered by: fc0224**
**Age at the time of incident(Occurence date): 26.0**

Address:   Home   **2250 E 12th Street   Oakland   CA   94606**                    Phone:

Additional Info:

---

1    **Suspect Description:**

2    **#1 - BMA, 30-40 years old, 5'8, 160 lbs, black hooded sweatshirt, black bandana**

3    **with white markings on it, black pants, black semi-auto handgun**

4

5    **#2 - BMA, unknown age, 5'7 to 5'10, 180-200 lbs, black jacket, grey hooded**

6    **sweatshirt, white t-shirt under sweatshirt, light colored jeans**

7

8    **Narrative:**

9    **On 05-29-11 at 2230 hours I was detailed to the Dominos at 22962 Clawiter #2 to**

---

Officer C. Fovel (446)   fc0224                          2                          2011-09708

10    investigate an armed robbery that had just occurred.

11

12    I arrived onscene and contacted the victim, Dominos delivery driver Masood

13    Qadir. Qadir related that he was working behind the counter when the above

14    described suspect #1 came into the store. S1 pointed a gun at Qadir and told him

15    to give him all the money. Qadir, fearing that he would be shot, reached into

16    his pockets and gave S1 the cash he had, approximately $150-200. The suspect

17    took the money and left out the front of the store going north where Qadir lost

18    sight of him. Qadir said he had never seen the suspect before the robbery.

19

20    Also in the store at the time of the robbery was Dominos employee Ramin Meher.

21    Meher related that he was busy making food in the back when he observed S1 point

22    the gun at Qadir and demand money. Meher moved from his location making food

23    and went to the rear of the store. Meher observed S1 leave the store but could

24    provide no further information.

25

26    The manager of Dominos, Shakaib Rahimi, responded to the store because he was

27    the only person with access to the security video. The robbery happened at 2228

28    hours but the video surveillance time reflected the time as 2101 hours. Dominos

29    has video cameras inside and outside the restaurant. I watched the video and

30    observed that there were two suspects involved in the robbery. I was able to see

31    how the suspects approached the business from the parking lot on the north side

32    of the business. While S1 goes into the business and commits the robbery, S2

33    stayed oustide out of sight and acted as a lookout. After the robbery S1 exited

34    the store and both S1 and S2 run east through the parking lot toward Saklan.

35    Rahimi related he would make a copy of the video surveillance and email it to

36    me.

37

38   I walked the parking lot of 22962 Clawiter and discovered a business further

39   east, Talimi Electric 22962 Clawiter #18, had video cameras that covered the

40   parking lot and, if operable, would have video of the suspects coming to and

41   leaving Dominos.

42

43   Another Dominos employee, Odonbayar Tserenbal, was seen on the video

44   surveillance pulling into the parking lot shortly after the suspects fled but he

45   stated he did not see anyone run from the business.

46

47   An area check was done by HPD units but the suspects were not located.

48

49   **Physical Evidence:**

50   CST Koscielniak responded and processed the scene. See supplement for details.

51   The statements of Qadir and Meher were completed using PUMA recording and

52   downloaded into the PUMA system.

53

54   **Witness Attempts:**

55   The surrounding businesses were closed at the time of the robbery so no

56   witnesses could be located.

57

58   **Follow-up:**

59   To RO to obtain a copy of video surveillance from Dominos.

60   To dayshift officer to contact Talimi Electric to see if they have video of

61   suspects.

62

63   **Case Status:**

64     **Open**

| Officer C. Fovel (446)   fc0224 | | Last Page | Hayward Police Department | 2011-09708 |
| --- | --- | --- | --- | --- |

Exhibit <u>B</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHYNA MCKAY AND JONATHAN PORTER,
INDIVIDUALLY AND AS
SUCCESSORS-IN-INTEREST TO THE
ESTATE OF JESSE PORTER; AND JESSE
PORTER JR., INDIVIDUALLY, AS            CASE NO. CV121613
SUCCESSOR-IN-INTEREST TO THE
ESTATE OF JESSE PORTER, AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF JESSE PORTER,

            Plaintiffs,

-vs-

CITY OF HAYWARD, FORMER HAYWARD
POLICE CHIEF RON ACE, IN HIS
INDIVIDUAL AND OFFICIAL
CAPACITIES, HAYWARD POLICE
OFFICERS LORING COX, MICHAEL
MILLER, and ROBERT PURNELL, and
DOES ONE through TWENTY FIVE,
inclusive,

            Defendants.
_____/

CERTIFIED COPY

DEPOSITION OF OFFICER JOSEPH RUVALCAVA


Taken before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958


February 15, 2013

1          A. Vaguely.

2          Q. How many people were on scene when you got

3     there?

4          A. I don't recall.  I could be number two,

5     number three.

6          Q. How do you alert them -- withdraw that.

7          I'm looking at the CAD sheet, and it says, "On

8     scene at 2233" with your call name.  Does it indicate

9     that you were the first person on scene then?

10         A. Apparently.

11         Q. And you're looking at the first page of the

12    CAD detail.  What does that tell you?

13         A. That according to the log, my identifier was

14    the first to say that I was on scene.

15         Q. Where does it indicate that?

16         A. Well, actually it doesn't say that.  It says

17    I would change location of National and Clawiter at

18    2232.

19         Q. And on the second page?

20         A. It shows an on scene for 2233.

21         Q. For you, right?

22         A. Correct.

23         Q. And then Officer McCrae at 2234?

24         A. Yes.

25         Q. Do you push a button to indicate that you're

DEPOSITION OF OFFICER JOSEPH RUVALCAVA

1    have had the same caption in the CAD printout.

2         Q. Is it, then, scanner protocol to broadcast it

3    through dispatch?

4         A. Yes.

5         Q. Is there any other mechanism, as a matter of

6    custom and habit, as to how you broadcast the

7    information?

8         A. We can manually type into our computer

9    information.

10        Q. Is it faster to do it through dispatch?

11        A. If we are away from our cars, yes.

12        Q. And here you were away from your car, right?

13        A. Yes.

14        Q. So the first instance in which the

15   information from the video was broadcasted was at 2305,

16   right?

17        A. Yes.   That's what it says.

18        Q. What did the video tell you or show you?

19        A. Just states that two suspects on video.   One

20   suspect never came in the store.   The direction of

21   flight, which is DOF, was back through the parking lot

22   towards North Lane, which would be east of the business.

23        Q. Are you familiar with that area?

24        A. Yes.

25        Q. Once you saw the video, did you form any

DEPOSITION OF OFFICER JOSEPH RUVALCAVA

1  impression as to which direction the suspect fled?

2  A. Say again.

3  Q. After you reviewed the video, did you have an

4  impression of which way the suspect went?

5  A. It appeared that the suspect would have went

6  eastbound toward North Lane.

7  Q. Did you form any opinion at that time as to

8  where the suspect would have gone?

9  A. Only based on the video.  The video would

10  have shown him running eastbound.

11  Q. Okay.  But --

12  A. Towards North Lane.  And using North Lane as

13  a major reference point.

14  Q. Okay.  But knowing the area, did you have any

15  opinion or idea about where the suspect would have gone?

16  A. No.

17  Q. Officer Fovel told us that if we look over

18  east of the Domino's Pizza, there is an apartment

19  complex directly across from North Lane.

20  A. Correct.  Across the street on Saklan, yes.

21  Q. And he said that's probably the 1400 block of

22  North Lane?

23  A. I don't know the exact addresses.

24  Q. Is that an area that you're familiar with in

25  an apartment complex?

1    STATE OF CALIFORNIA   )
                           )   ss
2    COUNTY OF ALAMEDA     )

3

4

5        I, Joan Grier, hereby certify that the witness in the

6    foregoing deposition named

7

8                OFFICER JOSEPH RUVALCAVA

9

10   was by me duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth in the within-entitled

12   cause; that said deposition was taken at the time and

13   place herein named; that the testimony of said witness

14   was reported by me, a certified shorthand reporter and a

15   disinterested person, and thereafter transcribed into

16   typewriting.

17

18       And I further certify that I am not of counsel or

19   attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said caption.

22

23   Date  2/22/13                  _Joan Grier_
                                    Joan Grier, C.S.R.
24

25

Exhibit <u>C</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CERTIFIED
COPY

CHYNA MCKAY AND JONATHAN PORTER,
INDIVIDUALLY AND AS
SUCCESSORS-IN-INTEREST TO THE
ESTATE OF JESSE PORTER; AND JESSE
PORTER JR., INDIVIDUALLY, AS          CASE NO. CV121613
SUCCESSOR-IN-INTEREST TO THE
ESTATE OF JESSE PORTER, AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF JESSE PORTER,

        Plaintiff,

-vs-

CITY OF HAYWARD, FORMER HAYWARD
POLICE CHIEF RON ACE, IN HIS
INDIVIDUAL AND OFFICIAL
CAPACITIES, HAYWARD POLICE
OFFICERS LORING COX, MICHAEL
MILLER, and ROBERT PURNELL, and
DOES ONE through TWENTY FIVE,
inclusive,

        Defendant.
_____/

DEPOSITION OF LISA REINKE

Taken before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958

February 13, 2013

DEPOSITION OF LISA REINKE

1           A. I was told that the path of the dog was from

2     the fence to the area of the shed where the tape measure

3     ended.

4           Q. So can you circle that area using the

5     photographs on Page 20.

6           A. (Witness complies.)

7           Q. And just draw an arrow out indicating the end

8     point of the canine and put "path of canine."

9           A. Path of canine, yes.

10          Q. Was there anything else that the photographs

11    were intended to document?  We've identified the path of

12    the dog, as well as the back side where the dog came

13    over.

14          Anything else that your photographs were intended

15    to document?

16          A. Just the general layout of the property and,

17    yeah, where the dog came over and the path of the

18    canine, to my understanding.

19          Q. Your report says, "The distance where the

20    subject was bitten was located approximately 20 feet to

21    the southwest of the location where Officer Cox and his

22    K9 had ascended the wall."

23          I'm very bad with directions.  What does that

24    mean?

25          A. That would be that the measuring tape was at

DEPOSITION OF LISA REINKE

1    20 feet, and that is, apparently, where the canine

2    contacted the subject.

3        Q. So we know that Mr. Porter -- you've never

4    seen photographs of the injury?

5        A. No.

6        Q. It was Mr. Porter's left leg that was bitten.

7    Were you given any indication about the position

8    of his body?

9        A. No.

10       Q. Or the location of his leg when the canine

11   bit him?

12       A. No, I was not.

13       Q. The point of the measuring tape -- the end

14   point of the measuring tape up against the shed, was

15   that supposed to represent the place where the bite

16   occurred?

17       MR. ALVARADO: Objection. Asked and answered. I

18   think she's testified that it's the path of the dog.

19       MS. CHENG: I know, but it conflicts here with

20   her report.

21       MR. ALVARADO: That's a different question.

22       Go ahead. You can answer to the extent you can.

23       THE WITNESS: At the time of the writing of my

24   report, that was the distance where the subject was

25   bitten. That was what I was told at the time, and it

1    STATE OF CALIFORNIA   )
                           )    ss
2    COUNTY OF ALAMEDA     )

3

4

5        I, Joan Grier, hereby certify that the witness in the

6    foregoing deposition named

7

8                          LISA REINKE

9

10   was by me duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth in the within-entitled

12   cause; that said deposition was taken at the time and

13   place herein named; that the testimony of said witness

14   was reported by me, a certified shorthand reporter and a

15   disinterested person, and thereafter transcribed into

16   typewriting.

17

18       And I further certify that I am not of counsel or

19   attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said caption.

22

23   Date  2/21/13                   _Joan Grier_
                                     Joan Grier, C.S.R.
24

25

Exhibit <u>D</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CHYNA McKAY and JONATHAN PORTER,
individually and as Successors-
in-Interest to the Estate of Jesse
Porter, and JESSE PORTER JR.,
individually, as the Successor-in-
Interest to the Estate of Jesse Porter,
and as personal representative of the
Estate of Jesse Porter,

        Plaintiffs,

    vs.                     No.  CV121613

CITY OF HAYWARD, FORMER HAYWARD
POLICE CHIEF RON ACE, in his individual
and official capacities, HAYWARD POLICE
OFFICERS LORING COX, MICHAEL MILLER,
and ROBERT PURNELL, and DOES ONE through
TWENTY-FIVE, inclusive,

        Defendants.

_____/

CERTIFIED COPY

DEPOSITION OF JEFF DIMICK

Taken before Marilyn J.B. Miller
Certified Shorthand Reporter
State of California
C.S.R. License No. 3891

January 23, 2013

DEPOSITION OF JEFF DIMICK

1        Q.   And you said you -- what did you notice about

2   the patient?

3        A.   Leg injury.

4        Q.   Do you remember how old he appeared to be or

5   his race or ethnicity?

6        A.   Older.

7        Q.   Elderly gentleman?

8        A.   Yes.

9        Q.   Overweight or thin?

10        A.   Thin.

11        Q.   And how about his mental status?  Did you

12   notice anything about his mental status?

13        A.   I remember he was out of it.  He wasn't

14   acting alert.  That's really all I can say.

15        Q.   When you say he wasn't acting alert, did you

16   consider his Glasgow coma score at the time?

17        A.   I considered his alert and oriented.  He

18   wasn't alert and oriented times four.

19        Q.   By times four tell me what criteria you use.

20        A.   He doesn't -- basically he isn't answering

21   where he is, who he is, how old he is, what day it is.

22        Q.   What did you notice about the leg injury?

23        A.   I noticed that his left calf was severely

24   injured.

25        Q.   And do your best to describe for me the

DEPOSITION OF JEFF DIMICK

1   STATE OF CALIFORNIA      )
                             )   SS
2   COUNTY OF CONTRA COSTA )

3

4

5       I, Marilyn J.B. Miller, hereby certify that the

6   witness in the foregoing deposition named

7

8                      JEFF DIMICK

9

10  was by me duly sworn to testify to the truth, the whole

11  truth, and nothing but the truth in the within-entitled

12  cause; that said deposition was taken at the time and

13  place herein named; that the testimony of said witness

14  was reported by me, a certified shorthand reporter and a

15  disinterested person, and thereafter transcribed into

16  typewriting.

17

18      And I further certify that I am not of counsel or

19  attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said caption.

22

23

24  Date_ 1/28/13 _          _____

25                           Certified Shorthand Reporter

Exhibit E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---



CHINA McKAY AND JONATHAN PORTERO-BROWN,
INDIVIDUALLY AND AS SUCCESSORS-IN-INTEREST
TO THE ESTATE of JESSIE PORTER; AND
JESSIE PORTER JR., INDIVIDUALLY, AS
SUCCESSOR-IN-INTEREST TO THE ESTATE of
JESSIE PORTER, AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
JESSIE PORTER,

                    Plaintiffs,

          vs.                               NO. CV121613

CITY OF HAYWARD, FORMER HAYWARD POLICE
CHIEF RON ACE, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES, HAYWARD POLICE
OFFICERS LORING COX, MICHAEL MILLER,
and ROBERT PURNELL, and DOES ONE
through TWENTY FIVE, inclusive,

                    Defendants.
_____/


DEPOSITION OF JONATHAN PORTERO-BROWN

THURSDAY, FEBRUARY 7, 2013


Reported by:
DIANA L. HARTIG, CSR #5788


LEINAALA YEE GRAY & ASSOCIATES
Certified Shorthand Reporters   Established 1983, CSR No. 2941
7185 Amador Valley Blvd., Dublin, California 94568 (925) 833-2016

1    A.        Uh-hmm.

2    Q.        And did you live in San Francisco?

3    A.        Briefly.

4    Q.        And after San Francisco, where did your family

5    move?

6    A.        Berkeley.

7    Q.        And do you recall how long you lived in Berkeley?

8    A.        Yeah, pretty much all my life once we moved over

9    there.

10   Q.        And what is your father's name?

11   A.        Jessie Porter.

12   Q.        And that's the decedent in this case, Mr. Porter,

13   Sr.?

14   A.        Yes.

15   Q.        Was he your biological father?

16   A.        No.

17   Q.        Do you know who your biological father was?

18   A.        Yes.

19   Q.        And what is his name?

20            MS. CHENG:  I'm going to object.  That invades his

21   privacy.

22            MR. ALVARADO:  Well, I mean, these questions go to

23   the issue of standing for these cases.  I mean, I have to

24   establish whether he has standing, so they go to that issue.

25            MS. CHENG:  Well, standing is under Civil Code

                                                          12

1    I had asked whether -- the deponent to answer the question

2    of who his biological father was, so the question is

3    pending.

4             Do you have any objection?

5             MS. CHENG:  I objected on grounds of invasion of

6    the deponent's privacy, that there are no legal gain for

7    that question, and I've instructed him not to answer.  It's

8    a question that potentially may be invasive and harassing,

9    and the deposition process is not supposed to harass the

10   witness.

11            MR. ALVARADO:  Q.  Were you adopted by Mr. Porter,

12   Sr.?

13   A.       No.

14   Q.       Were there any other formal adoption procedures in

15   any other states?

16   A.       No.

17   Q.       Does there exist any records of adoption?

18   A.       No.

19   Q.       And what is your mother's name?

20   A.       Suzanne.

21   Q.       And what is Suzanne's last name?

22   A.       Portero.

23   Q.       And were Mr. Porter and Suzanne Portero married?

24   A.       Yes.

25   Q.       And do you recall or are you aware of when they

14

```
1    A.        Yep.  Excuse me.  Yes, it would be Jessie, Jr.

2    Q.        And who would spend the most time with him in the

3    year before his death?

4    A.        Me.

5    Q.        And was Mr. Porter providing financial support to

6    any of his children prior to his passing?

7    A.        No.

8    Q.        Did Mr. Porter provide you financial support prior

9    to his passing?

10   A.        No.

11   Q.        Do you know if any of his other children provided

12   financial support to him prior to his passing?

13   A.        Meaning me or...

14   Q.        Any of his children.

15   A.        Yes.

16   Q.        And how about yourself, did you provide financial

17   support?

18   A.        (Witness nods head.)

19   Q.        What kind of financial support --

20   A.        Yes.

21   Q.        -- did you provide him?

22   A.        Are you asking me how much?

23   Q.        Sure.  How much monthly, let's say?

24   A.        Well, it wasn't --

25             MS. CHENG:  I think that, again, sort of invades
```

19

1    STATE OF CALIFORNIA          )
                                  )    ss.
2    COUNTY OF ALAMEDA            )

3              I, DIANA L. HARTIG, do hereby certify:

4              That JONATHAN PORTERO-BROWN, the witness in the

5    foregoing deposition, was by me duly sworn to testify the

6    truth, the whole truth, and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was reported by me at the

9    time and place therein stated and under my direction was

10   thereafter transcribed as herein set forth;

11             That, if signed, the deposition was read by or to

12   said witness, corrected in every particular desired, and was

13   thereafter subscribed by said witness;

14             That, if unsigned, the deposition was retained by

15   me at the offices of LEINAALA YEE GRAY, a Certified

16   Shorthand Reporter, 7185 Amador Valley Boulevard, Dublin,

17   California, 94568, and was available for reading, correcting

18   and signing by said witness unless otherwise stipulated.

19             I further certify that I am not connected with,

20   nor related to any of the parties in said action or to their

21   respective counsel.

22             IN WITNESS WHEREOF I have set my hand and affixed

23   my seal of office this 22nd day of February, 2013.

24                              _____
                               DIANA L. HARTIG, CSR 5788

25

                                                         29