MICHAEL S. LAWSON (SBN 048172)
City Attorney
RAFAEL E. ALVARADO JR. (SBN 247904)
Assistant City Attorney
MICHAEL VIGILIA (SBN 228353)
Assistant City Attorney
JOSEPH BRICK (SBN 253132)
Deputy City Attorney
CITY OF HAYWARD
777 B Street, 4th Floor
Hayward, CA 94541-5007
Tel: (510) 583-4450
Fax: (510) 583-3660

Attorneys for Defendant City of Hayward,
Former Police Chief Ron Ace, Officers Loring Cox,
Michael Miller and Robert Purnell

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHINA McKAY AND JONATHAN PORTERO-BROWN, INDIVIDUALLY AND AS SUCCESSORS-IN-INTEREST TO THE ESTATE of JESSE PORTER; and JESSE PORTER JR., INDIVIDUALLY, AS SUCCESSOR-IN-INTEREST TO THE ESTATE OF JESSE PORTER, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JESSE PORTER,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF HAYWARD, FORMER HAYWARD POLICE CHIEF RON ACE, IN HIS INDIVIDUAL AND OFFICAL CAPACITIES, HAYWARD POLICE OFFICERS LORING COX, MICHAEL MILLER and ROBERT PURNELL, and DOES ONE through TWENTY FIVE, inclusive,<br><br>Defendants. | Case No. CV 12-1613 (NC)<br><br>DECLARATION OF OFFICER LORING COX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF CLAIMS |

McKay et al. v. City of Hayward, et al.
USDC Case No. CV 12-1613                    -1-                    Declaration of Loring Cox In Support of
Defendants' Motion for Summary Judgment

I, Loring Cox, declare as follows:

1. I am employed as a City of Hayward as a police officer in the Patrol Division as a canine handler for the Hayward Police Department ("HPD"). I have been a Hayward Police Officer since November 2005 and a canine handler since June 2007.

## SERVICE BACKGROUND

2. I have served as a police officer for the city of Bellevue, Washington. I was a Bellevue Police Officer between 2003 and 2005.

3. I have also served as a police officer for the City of San Jose, California. I was a San Jose Police Officer between 2000 and 2002.

4. Prior to my time as a police officer for the aforementioned law enforcement agencies, I served our country for six years as a Cavalry Scout with the United States Army. My stations included Wiesbaden, Germany, Fort Bragg, North Carolina, Tongduchon, Korea, and Fort Carson, Colorado. I was honorably discharged from the Army in 1999 and received various decorations, medals, badges, and campaign ribbon awards, including the Army Achievement Medal, the Army Good Conduct Medal, the National Defense Service Medal, the Noncommissioned Officer's Professional Development Ribbon, the Army Service Ribbon, and the Overseas Service Ribbon and the Army Commendation Medal each on two occasions. I also achieved and Expert Marskman Qualification Rifle Badge, a Parachute Badge and a Silver German Marksmanship Badge.

## LAW ENFORCEMENT CANINE TRAINING

5. At the time of the alleged incident, I had completed law enforcement canine training with my police canine "Nicky," who was involved in the alleged incident, and received our trainings and certifications together. At the time of the alleged incident, I had completed 312 hours of formal trainings and certifications with Nicky:

    a. Certified as a "Police Service Dog Team" by Alderhorst Police Dog Handler School, following 200 hours of Police Service Dog Course. January 2009.

1          b.     Completion of a 40 Hours of training at the International Police K9 Conference by the Eden Consulting Group and the Alameda County Sheriff's Office. June 2009.

         c. Certificate of Completion of 8 hour course in "Canine Team Evaluator's Course," by Alderhorst International, Inc., and the Pomona Police Department. October 2010.

         d.     Certificate of Completion of 24 hour course in "K-9 Narcotics/ Explosive/Patrol Detection Instruction," by the California Narcotic Canine Association. January 2011.

         e.     Certificate of Completion of 40 hour course in "Canine Trailing Course," by the Placerville Police Department and Georgia K-9 National Training Center. April 2011.

         f.     Certified as a "K-9 Trailing Technical Handler" by Georgia K-9 National Training Center. April 2011.

6.     I have continued training with my police canine Nicky and completed an additional 148 hours of formal training and certifications since the alleged incident:

         a.     Certificate of Completion of 8 hour course in "Advanced K-9 Handler Training," by the Elk Grove Police Department. September 2011.

         b.     Certificate of Completion of 40 hour course in "Canine Conference and Training Seminar," by the Western States Police Canine Association. October 2011.

         c.     Certificate of Completion of 30 hour course in "Detection/Nosework 1," by the Michael Ellis School for Dog Trainers. May 2012.

         d.     Certificate of Completion of 30 hour course in "Detection/Nosework 2," by the Michael Ellis School for Dog Trainers. May 2012.

         e.     Certificate of Completion of 40 hour course in "Canine Conference and Training Seminar," by the Western States Police Canine Association. October 2012.

7.     In addition to the above training and certifications, my police canine Nicky has consistently passed a yearly evaluation by independent evaluators as part of the certification process. Nicky has been successful in the categories of obedience, search ability, apprehension, and handler protection on a yearly basis.

8.     Moreover, the Hayward Police Department canine unit participates in a weekly eight (8) hour departmental canine trainings. I have consistently participated in said trainings with Nicky. I have also performed individual trainings with Nicky during our shifts. During these sessions, we train in the various categories of skills important for police canines, including the skills necessary to perform successful searches for suspects:

a.     Between November 2008 and May 2011, I trained Nicky in the category of "search" on approximately 382 occasions. The training sessions are recorded in a form titled "Hayward Police K-9 Unit Activity and Training Evaluation." The search training evaluates Nicky's ability to obey the search command and his commitment to a search. During these training sessions, Nicky performed a successful search on 360 occasions, demonstrating a training success rate of 94%. In those instances where Nicky was not successful in search training, I frequently performed an immediate re-training and recorded the successful re-training in the evaluation form.

b.     Between November 2008 and May 2011, I trained Nicky in the category of "find" on approximately 155 occasions. The training sessions are recorded in a form titled "Hayward Police K-9 Unit Activity and Training Evaluation." The find training evaluates Nicky's ability to obey the find command and locate and make contact with the source of an odor. During these training sessions, Nicky performed a successful find on 146 occasions, demonstrating a training success rate of 94%. In those instances where Nicky was not successful in find training, I frequently performed an immediate re-training and recorded the successful re-training in the evaluation form.

c.     Between November 2008 and May 2011, I trained Nicky in the category of "alert" on approximately 145 occasions. The training sessions are recorded in a form titled "Hayward Police K-9 Unit Activity and Training Evaluation." The alert training evaluates Nicky' ability to obey the alert command, locate the source of an odor behind an obstacle and bark to alert the handler. During these training sessions, Nicky performed a successful alert on 139 occasions, demonstrating a training success rate of 96%. In those instances where Nicky

McKay et al. v. City of Hayward, et al.
USDC Case No. CV 12-1613                            -4-                    Declaration of Loring Cox In Support of
                                                                            Defendants' Motion for Summary Judgment

was not successful in alert training, I frequently performed an immediate re-training and recorded the successful re-training in the evaluation form.

      d.    Between November 2008 and May 2011, I trained Nicky in the category of "On-Leash Recall" on approximately 167 occasions. The training sessions are recorded in a form titled "Hayward Police K-9 Unit Activity and Training Evaluation." The training evaluates Nicky's ability to obey the verbal recall command by returning to the handler on command while on-leash. During these training sessions, Nicky performed a successful on-leash recall on 152 occasions, demonstrating a training success rate of 91%. In those instances where Nicky was not successful in on-leash recall training, I frequently performed an immediate re-training and recorded the successful re-training in the evaluation form.

      e.    Between November 2008 and May 2011, I trained Nicky in the category of "Off-Leash Recall" on approximately 293 occasions. The training sessions are recorded in a form titled "Hayward Police K-9 Unit Activity and Training Evaluation." The training evaluates Nicky's ability to obey the verbal recall command by returning to the handler on command while off-leash. During these training sessions, Nicky performed a successful off-leash recall on 262 occasions, demonstrating a training success rate of 89%. In those instances where Nicky was not successful in off-leash recall training, I frequently performed an immediate re-training and recorded the successful re-training in the evaluation form.

9.    I have compiled statistics related to the usage of Nicky in the field. Attached as Exhibit B are the year-end compilations of the activity for Nicky during the years 2009 through 2012. Between those years:

      a.    Calls For Service: We responded to 3,100 calls for service, each individual call having the potential for an accidental bite. Only three incidents involved an accidental bite prior to Mr. Porter, resulting in 0.09 times out of 100 calls. In other words, less than one time out of 100 calls. And two of those incidents involved other law enforcement officers, not a bystander. There have been no accidental bites after Mr. Porter.

   b. Bite-to Surrender Percentage/Ratio: Nicky performed an apprehension involving a bite less than 15% of the time used. Nicky recorded 26 bites and 187 surrenders (which did not involve a bite).

## MAY 29, 2011 INCIDENT

  10. On May 29, 2011, I was working as a police officer and accompanied by police canine Nicky. At approximately 10:30 p.m., I heard Hayward police radio assign patrol officers to an armed robbery of a Domino's Pizza located at 22962 Clawiter Road in Hayward. Hayward police radio indicated the suspect was a black male adult armed with a black semi-automatic handgun. The initial information provided by Hayward police radio was that the suspect fled out of the front door of the business in an unknown direction.

  11. At approximately 10:35 p.m., I arrived at 22962 Clawiter Road and prepared myself to conduct a track of the suspect. While I waited for the arrival of cover officers, I gathered a 33-foot lead from the trunk of my police car. The 33-foot lead is used for the purpose of tracking a suspect.

  12. At approximately 10:36 p.m., updated information was transmitted via Hayward police radio indicating the suspect fled either north towards a Jack-in-the-Box restaurant or towards North Lane. North Lane is located in an eastbound direction. To reach North Lane from the Domino's, a person must travel east through the Domino's parking lot.

  13. Officers Robert Purnell and Michael Miller arrived on scene at approximately 10:37 p.m. I told the officers that we were going to try to pick up a trail. Officers Purnell and Miller served as cover officers during the search.

  14. I gathered Nicky from the police car to start the canine track, placed Nicky in a harness and carried Nicky to the driveway servicing the Dominos business. The driveway leads into a parking lot and is situated on the north side of the business. I began the track at this location since it was a possible flight route. Based upon the available information, I reasonably believed that the suspect fled east through the Domino's parking lot. Surveillance video from the Domino's business would confirm that the suspect fled east through the parking lot.

15. At approximately 10:38 p.m., we began the canine track. I waved towards the ground and commanded Nicky to "track." Nicky began to "cast out" and sniff on the ground in search for human odor. I soon observed that Nicky's tail went rigid and his ears cropped forward. Nicky's behavior indicated that he picked up a scent and he began to trail in an eastbound direction towards Saklan Road. I reasonably believed that Nicky had located the scent of the suspect.

16. Nicky continue to trail eastbound until we reached the west sidewalk of Saklan Road. Nicky then made a left turn onto the west sidewalk Saklan Road and headed in a northbound direction until we reached West Winton Avenue.

17. At the corner of Saklan and West Winton, I observed that Nicky's head came up, his tail relaxed and he began to sniff towards the left and the right. This indicated that Nicky may be looking for the scent. Nicky gave me no positive indication of odor towards the west along West Winton. And since the Hayward Municipal Airport is located north of this location, I reasonably believed that the suspect headed in an eastbound direction along West Winton.

18. We crossed Saklan Road and headed east along West Winton Avenue. Once we crossed Saklan Road, I observed Nicky display trailing behavior. Nicky moved his nose close to the ground, his tail went rigid and he began to track in an eastbound direction. As Nicky is trained to only follow the same scent, I reasonably believed that Nicky had located the scent of the suspect once again.

19. Nicky continued to trail east along West Winton Avenue until we reached the driveway of a business complex located at 1204 West Winton Avenue. Nicky displayed behavior indicating the canine was now trailing an air scent, which I believed indicated that we were getting closer to the suspect. Nicky took a right turn and sprinted south down the driveway until we reached an eight-foot high concrete fence at the rear of the business complex.

20. The eight-foot high concrete wall runs along the length of the rear of the business complex. The concrete wall separates the business complex on the north side of the wall from a mobilehome park on the south side of the wall. I observed Nicky paw at the wall indicating that

he wanted to continue the trail. I reasonably believed that Nicky's behavior indicated the suspect continued his flight over the concrete wall.

21. I observed wooden pallets situated near the concrete wall. We leaned a wooden pallet against the wall and I climbed the pallet to look over the wall. Nicky remained in a down position as I looked over the wall. I saw the backyards of several mobilehomes and landscaping. I did not see any people in the backyards or in the landscaped areas. I was not aware that any person was in the area.

22. I decided to continue the search with Nicky on the other side of the concrete wall. I decided to scale the wall first in order allow Nicky to continue its trail. I was also concerned that if the cover officers scaled the wall first, it would place the officers' safety in jeopardy since the location of the suspect was still unknown. Furthermore, I was concerned that the cover officers would impact the track by disturbing the scent trail and/or introducing foreign odors.

23. Based on the suspect flight from the robbery scene and possessing a semi-automatic handgun, I decided not give a warning prior to entering into the backyard with Nicky.

24. I picked Nicky up by his harness, placed him on my shoulder and climbed the pallet onto the wall. I straddled the wall and lowered Nicky by his leash onto the ground. Officer Purnell held the end of the leash as I lowered Nicky, but I maintained control of Nicky on the leash. Once on the ground, Nicky remained in a down position.

25. I jumped down off of the wall to join Nicky. I then gave Nicky a command to "track" in order to continue the suspect search. The track command instructs Nicky to continue the trail and alert when Nicky locates a suspect. I did not give Nicky his commands to "search and bite" or to "bite," which are two separate commands given in Dutch.

26. After receiving the command to track, Nicky immediately traveled forward into bushes and briefly out of sight. I then heard Nicky's paws pushing against the ground. I pulled out my firearm and yelled to the cover officers that I thought Nicky found the armed suspect. As I moved closer to Nicky and he came into view, I observed that he was not holding an armed suspect. I ran over to Nicky, grabbed the canine and ordered him to release the bite. Nicky obeyed the command.

McKay et al. v. City of Hayward, et al.
USDC Case No. CV 12-1613                    -8-                    Declaration of Loring Cox In Support of
                                                                    Defendants' Motion for Summary Judgment

27. Nicky had bitten a person who I know now was Mr. Jesse Porter. Mr. Porter appeared unconscious at the time of the bite. He did not make any noise during the bite and did not move in response to the bite. I observed Mr. Porter begin to regain consciousness after I ordered Nicky to release the bite. I noted that Mr. Porter was lethargic and non-responsive.

28. The Hayward Fire Department arrived soon thereafter to provide medical aid to Mr. Porter. My patrol car was transported to the incident location and I secured Nicky in the vehicle. I then briefed the on-scene supervisor concerning the event. I also called the canine unit manager via telephone to brief him on the incident.

29. American Medical Response arrived at the scene to provide further medical care to Mr. Porter and transport him to Eden Medical Center. I followed the ambulance to the hospital.

30. At the hospital, I made contact Mr. Porter as he was receiving medical treatment. Mr. Porter did not have a recollection of the incident. He did not recollect the police canine biting him. Mr. Porter did not recollect lying down outside of his mobilehome near the shed to his unit. He did, however, recollect where he lived, including the street, city and house number.

31. On May 30, 2011, I returned to Eden Medical Center and spoke to Mr. Porter in his hospital room. Mr. Porter recalled leaving his mobile home unit and going to his shed during daylight sometime after 7:30 p.m. to sweep up. He recalled stepping on a rock and falling outside of the shed. Mr. Porter lost consciousness and did not recall anything after that point, including the dog bite which occurred several hours later while he was still unconscious.

32. Attached hereto as Exhibit B is a true and correct copy of the report I prepared concerning the incident at issue.

I declare under penalty of perjury under the laws of the United States and the laws of the state of California that the foregoing is true and correct.

Executed this 23rd day of April, 2013, in Hayward, California.

OFFICER LORING COX

Exhibit <u>A</u>

**DEFENDANTS' ADMINISTRATIVE MOTION TO FILE UNDER SEAL THE UNREADACTED VERSION OF EXHIBIT A TO THE DECLARATION OF OFFICER LORING COX FILE CONCURRENTLY WITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF CLAIMS**

Exhibit <u>B</u>

# HAYWARD POLICE DEPARTMENT
## POLICE REPORT
300 West Winton Avenue Hayward, California 94544 (510) 293-7272

| | |
|---|---|
| Report Type: **Supplement Report** | Report Number: **2011-09708** |
| Reporting Officer: **Police Officer L. Cox (488)   cl0712** | Report Taken Date: **05/30/2011** |
| Occurred From: **Sunday   05/29/2011   10:30 PM** | Case Status: **Open** |
| Occurred To: | Clearance Type: |
| Reported Date/Time:   **05/29/2011   10:30 PM** | Clearance Date: |

| | |
|---|---|
| Incident Type: **Animal - Animal Bite** | Beat: **D** |
| Attempted/Completed: **Reported** | Offense Code: **26** |
| Location Occurred: **1200 W Winton Avenue 11 Hayward CA 94544** | |
| Cross Street: | Location Type: **Field/Woods** |

| | |
|---|---|
| Incident Type: **211 PC Robbery** | Beat: **D** |
| Attempted/Completed: **Completed** | Offense Code: **3** |
| Location Occurred: **22962 Clawiter Road   Hayward CA 94544** | |
| Cross Street: | Location Type: **Restaurant** |

Approving Supervisor: **Sergeant R. Sisson (122)**      Approval Date/Time: **06/07/2011   05:13 PM**

---

**Subject: Other**                                                                          DOB: **09/04/1921**
Name: **Portero, Jesse Porter**
Status:

| | | | |
|---|---|---|---|
| Race: **Filipino** | Height: **509** | Complexion: | |
| Gender: **Male** | Weight: **140** | Eyes/Hair **Brown** | **Gray   Short** |
| Facial Hair: | | Build: | |

Additional Information: **This report data was entered by: cl0712**
**Age at the time of Incident(Occurence date): 89.0**

Address: **Home   1200 W Winton Avenue 11 Hayward CA**                  Phone:
Additional Info:

---

**Subject: Other**                                                                          DOB: **04/16/1938**
Name: **Wallicer, Marlene**
Status:

| | | | |
|---|---|---|---|
| Race: **White** | Height: | Complexion: | |
| Gender: **Female** | Weight: | Eyes/Hair | |
| Facial Hair: | | Build: | |

Additional Information: **This report data was entered by: cl0712**
**Age at the time of Incident(Occurence date): 73.0**

Address: **Home   1200 W Winton Avenue 11 Hayward CA**                  Phone: **(510) 783-5801**
Additional Info:

---

**NARRATIVE:**

2

3   On 03-15-2011, I was working as a Police Officer for the City of Hayward. I was

4   wearing a full police class "C" utility uniform with all required patches and

5   insignia. I was driving fully marked Canine Patrol car #258 with canine warnings

6   affixed to each rear door. This vehicle is distinctly painted and marked in

7   accordance with the CA Vehicle Code. I was working with my Police Service Dog

8   (PSD) "Nicky". My main focus as a Canine Handler was burglary suppression and

9   response to high risk incidents including those involving weapons.

10

11   At 2230 hrs I heard radio assign patrol officers to an armed robbery of a

12   business at 22962 Clawiter Rd. A BMA walked into the business and robbed the

13   clerk with a black semi-automatic handgun. The male left the business on foot

14   and was last seen running east through a parking lot towards Saklan.

15

16   I responded to scene to see if my K9 partner could pick up a scent trail left by

17   the suspect. I arrived at 2235 hrs and with Ofc Miller and Purnell began a

18   trail at 2242 hrs. I placed K9 Nicky in his tracking harness and attached him to

19   a 33' lead. I ordered K9 Nicky to track and watched as he began to follow a

20   scent trail east through the parking lot on the north side of the business.

21

22   K9 Nicky tracked to the west sidewalk of Saklan and turned n/b on the sidewalk.

23   At the intersection of W. Winton/Saklan K9 Nicky crossed e/b and began to track

24   on the south sidewalk of W. Winton. At the business park of 1212 W. Winton K9

25   Nicky began to track south into the rear parking lot. K9 Nicky tracked up to an

26   eight foot high concrete wall and stopped and stared at it. Based on his

27   behavior I believed the suspect had crossed over the wall into the Hayward

28   Mobile Country Club (1200 W. Winton Ave).

29

30  Due to the height (measured 8') of the wall I found a pallet nearby and leaned

31  it against the wall. I climbed to the top of the pallet and looked over but saw

32  no people in the rear areas of the trailer homes. I had Ofc Purnell hold the 33'

33  line while I lifted K9 Nicky over the wall. I had Purnell hold K9 Nicky above

34  the ground while I scaled the wall. When I was on top of the wall I told Purnell

35  to lower K9 Nicky to the ground which he did. I jumped down from the wall and

36  told K9 Nicky to resume the track while I gathered the 33' line from the top of

37  the wall.

38

39  I saw K9 Nicky track immediately west into a series of shrubs and potted bushes

40  behind #11. These bushes surrounded the east and north side of a utility shed

41  and blocked my view of the ground around the shed. I saw K9 Nicky enter the

42  bushes and immediately stop. I heard nothing but saw K9 Nicky trying to back out

43  of the bushes. I believed he had taken hold of something and thought it was the

44  armed suspect. I radioed that the K9 had contacted something. The distance from

45  the starting point at the wall was 19 feet.

46

47  I saw K9 Nicky pull a human figure partially into view and I could see he was

48  biting the person by the left calf. I looked at the person and saw he was an

49  elderly Asian male. I Immediately ran to K9 Nicky and took him by his collar and

50  told him to release the bite. K9 Nicky immediately released the bite and I put

51  him in a down stay away from the person. I now know this person to be (O)

52  Portero.

53

54  I immediately requested HFD and an ambulance to provide aid to (O) Portero. HFD

55  arrived within four minutes and provided first aid to (O) Portero. While waiting

56  for HFD I noted that (O) Portero was lethargic and non-responsive. Ofc Purnell
57  told me (O) Portero was very cold to the touch and did not answer any questions.
58  I could see that (O) Portero was confused and did not know what was happening.
59  I could see his skin was very pale and his lips were lacking in color. HFD told
60  me that (O) Portero was hypothermic and had likely been in the cold for several
61  hours.
62
63  (O) Wallicer came to the back door of #11 and asked what was happening. She
64  identified herself as (O) Portero's caretaker and said he lived in #11 with her.
65  (O) Wallicer said (O) Portero should have been in the house and had no idea why
66  he was outside. (O) Portero had gone to bed at 1800 hrs and she assumed he was
67  still there.
68
69  AMR transported (O) Portero to Eden Hospital for treatment. I followed the AMR
70  ambulance to Eden Hospital. At Eden I found the attending physician had ordered
71  (O) Portero be wrapped in warming blankets and placed under heat lamps in an
72  attempt to raise his core body temperature. After twenty minutes of warming his
73  body temperature was 94.6 degrees. It should be noted that mild hypothermia
74  begins at 95 degrees. The Dr. said (O) Portero likely would not had lived if
75  left in the elements through the night. (O) Portero was later taken to surgery
76  to treat the injuries to his left leg.
77
78  While (O) Portero was being treated I tried to ask him about what happened that
79  night. (O) Portero was at times very clear and articulate and others seemed
80  confused and had no memory of what happened. (O) Portero told me he knew it was
81  Sunday and recalled leaving the house after going to bed, (O) Portero knew it
82  was still daylight when he went out but had no idea why he would have gone

```
83   outside. (O) Portero did not know he had fallen and was unconscious outside. He
84   did not remember the dog biting him. He did not understand why he was in the
     hospital.
86
87   I returned to Eden on 05-30-11 and spoke to (O) Portero in his hospital room.
88   (O) Portero was now lucid and cognizant of his surroundings. (O) Portero said he
89   remembered going to bed at 1800 but getting up after about thirty minutes of
90   not falling asleep. He went outside without telling (O) Wallicer he was awake.
91   (O) Portero intended to go to the shed and straighten up. (O) Portero fell down
92   and went unconscious. The next thing he knew it was dark and the dog was biting
93   him. (O) Portero told me he understood what happened and why. He explained that
94   he understood the dangers of police work. I recorded this interview to PUMA and
95   later downloaded it to the departmental server.
96
     PHYSICAL EVIDENCE:
98
99   I had CST Koscielniak take digital photographs of the scene where (O) Portero
100  was found. Several PUMA recordings of witness attempts were downloaded to the
101  department server.
102
103  Rpt Status:Refer this supplement with the original.
```